# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## BEAUFORT DIVISION

| | |
|---|---|
| CHRISTOPHER S. INGLESE, ) | Civil Action No.: 9:22-cv-01526-DCN-MGB |
| ) | |
| Plaintiff, ) | **COMPLAINT** |
| ) | **Violation of Title VII; Retaliation** |
| vs. ) | **Based on Gender and Race** |
| ) | |
| COUNTY OF BEAUFORT, ) | |
| ) | |
| Defendant. ) | **JURY TRIAL REQUESTED** |
| _____) | |

The plaintiff above named, by and through undersigned counsel, complains of the acts of the defendant as follows:

## PARTIES AND JURISDICTION

1. That the plaintiff is currently a citizen and resident of the County of Newberry, State of South Carolina; at the time of the actions complained of herein, plaintiff was a citizen and resident of the County of Beaufort, State of South Carolina.

2. That, upon information and belief, the defendant County of Beaufort ("defendant" or "County") is a governmental entity doing business and maintaining offices and agents in the County of Beaufort, State of South Carolina.

3. That this court has federal question jurisdiction of the above-styled action pursuant to 42 U.S.C. § 2000e-2, 3 and 5 (The Civil Rights Act of 1964 or "Title VII") and 28 U.S.C. § 1331.

4. That venue for all causes of action stated herein lies in the District of South Carolina, Beaufort Division, as defendant does business here and a substantial portion of the facts giving rise to plaintiff's claims occurred here.

1

**CONDITIONS PRECEDENT**

5. That plaintiff has exhausted all administrative remedies and conditions precedent, including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of the foregoing action, all of which are more fully described below.

6. That on or about January 15, 2021, and as a result of defendant's discriminatory conduct, all of which is more fully described below, plaintiff timely filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based upon gender and race and retaliation all in relation to his termination from his Deputy Administrator position at defendant.

7. That on or about February 16, 2022 plaintiff received a Notice of Rights to Sue from the EEOC regarding the complaint described in Paragraph 6 above and as such, this action has been timely filed.

**FACTUAL ALLEGATIONS**

8. That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 7 hereinabove as fully as if set forth verbatim.

9. That plaintiff is a Caucasian male.

10. That plaintiff is an attorney barred and licensed to practice law in the State of South Carolina.

11. That in or around April of 2017, defendant hired plaintiff as an Assistant County Attorney, a job which entailed such duties as, among other things, providing legal advice to elected officials, prosecuting cases in Magistrates Court, and litigating tax sale disputes.

12. That plaintiff was hired, trained and supervised in the position by Thomas Keaveny, II ("Keaveny"), the County Attorney. For his part, Keaveny reported to the County

Administrator, the top position at defendant, and a position occupied by five (5) different employees during the course of plaintiff's employment with defendant (April 2017 through June 3, 2020).

13. That as of on or about April 15, 2019, Ashley Jacobs ("Jacobs"), a Caucasian female, was the County Administrator.

14. That when plaintiff started working for the defendant as an Assistant Attorney, there were two (2) other attorneys in the office assisting him – plaintiff's Supervisor Keaveny and another attorney, Joshua Gruber ("Gruber"), (who also served as the Deputy Administrator and later as the Interim Administrator).

15. That by the summer of 2018, Gruber resigned and Keaveny took the position of Interim Administrator, leaving plaintiff as the sole attorney in the office. Although Keaveny resigned from the Administrator position after about two (2) or three (3) months, he decided to stay on and serve as the unofficial Deputy Administrator for the new Interim Administrator, John Weaver ("Weaver"), until on or about April of 2019.

16. That as a result of the above circumstances, plaintiff ran the County Attorney's Office on his own from the summer of 2018 until in or around April 2019. Working with such a reduced staff presented its share of challenges. Nonetheless, plaintiff (and to some extent Keaveny) kept the department functioning in a competent fashion.

17. That in or around September of 2019, plaintiff was promoted into the position of Deputy Administrator, the second highest job at defendant. As Deputy Administrator, plaintiff reported directly to Jacobs, the County Administrator.

18. That as Deputy Administrator, plaintiff had four (4) Division Heads (or Assistant Administrators) over the following four (4) departments or offices reporting directly to

him: (a) Finance, which encompassed approximately six (6) other offices including, but not limited to, the Assessor, the Registrar of Deeds, and Risk Management; (b) Public Safety, which included six (6) or seven (7) offices including, for example, Animal Services and Code Enforcement; (c) Civic Engagement and Outreach, which encompassed seven (7) or eight (8) different offices including Alcohol and Drug Abuse, Human Services, and Records Management; and (d) Public Works.

19. That the defendant's elected officials were not a part of the above chain of command. These positions included the Auditor, the Sheriff, the Coroner, the Clerk of Court, the Probate Judge, the Solicitor, and the Treasurer.

20. That at the time the defendant also had an interim, part-time Human Resource Director, Ashley Kincaid ("Kincaid").

21. That plaintiff remained in his job as Deputy County Administrator until June 3, 2020, the date he was illegally fired.

22. That throughout plaintiff's entire employment at defendant, while in both of his jobs (Assistant County Attorney and Deputy Administrator), plaintiff performed his job duties in an above-satisfactory fashion and otherwise maintained an excellent employment record there. To this end, on or about May 21, 2018, Keaveny gave plaintiff an overall rating of 4.33 out of 5.0 on plaintiff's 2018 employment evaluation which, under defendant's evaluation metrics, means that plaintiff was a "high performer." On or about November 6, 2019, just seven (7) months before plaintiff's termination, Keaveny executed and filed plaintiff's 2019 performance evaluation on which he gave plaintiff an overall rating of 4.35 out of 5.0, again a rating which signifies plaintiff was a high performer that year.

23. That moreover, in both positions plaintiff's peers and superiors repeatedly praised his work performance, motivation and competency. In plaintiff's job as Deputy Administrator, Jacobs routinely told plaintiff in one way or another that he was a strong performer. For example, she told plaintiff that he was doing a great job and to keep up the good work; that she was a big fan of his; and that she wanted plaintiff to replace her if she left the defendant. Consistent with the above, the plaintiff was never disciplined in any shape or form the entire time he worked at the defendant.

24. That as Deputy Administrator, some of plaintiff's accomplishments included, but were not limited to, the following:

- ❖ As Deputy Administrator, plaintiff researched and then prepared and drafted a sick leave policy for the employees of defendant. Plaintiff then advocated for its adoption to Jacobs and two (2) prior Administrators. Ultimately, plaintiff presented the policy to County Council who approved it in or around December of 2019. The said sick leave policy for employees at the defendant is still currently in place;

- ❖ As Deputy Administrator, plaintiff immediately established a review and approval process for Council and Committee agenda items. Prior to plaintiff's tenure, there was no such process, a circumstance that created a lot of unneeded chaos. Plaintiff's newly established process put an end to the chaos; and

- ❖ Finally, by way of example, under plaintiff's direction as Deputy Administrator, plaintiff's Finance staff created a budget manual for department heads and elected officials to use during budget seasons. Prior to this, there was no resource available for the department heads or elected officials to consult for instructions on how to enter budget information which, again, during budget season would cause a lot of stress and confusion with the elected officials and department heads often asking the same questions repeatedly. Again, this policy put an end to a lot of confusion.

25. That after being hired as Deputy Administrator in September of 2019, all went well for plaintiff and he enjoyed a productive working relationship with Jacobs. With that

5

said, there were issues brewing which involved the conduct of the County Auditor, Jim Beckert ("Beckert"), an older, Caucasian male employee who had been elected as County Auditor in or around November of 2014.

26. That according to some of the employees he worked with at defendant, Beckert was opinionated, at times antagonistic, difficult to work with, rude, manipulative and he could be a bully. Apparently in the past, Beckert had sued the County Treasurer and the defendant and had adversarial relationships with the previous County Administrator and previous Assessors. According to a news report from WSAV-TV, on or about May 21, 2018, Sherri Zedd, a South Carolina GOP official who is Jewish, accused Beckert of addressing her by a name inscribed on the gates of Nazi concentration camps that had an anti-Semitic meaning. The *Island Packet* of Hilton Head reported the Beaufort County Republican Party voted 14-0 to ask Beckert to write a formal letter of apology.

27. That in or around March and April 2019, Beckert took it upon himself to start a public dispute against Alicia Holland ("Holland"), the County Chief Financial Officer who is Caucasian and also female, over millage rates she established. Beckert's disputes with Holland involved Beckert publicly attacking her through the media and to her superiors at defendant, by questioning her integrity and competence. Beckert's self-imposed battle against Holland ended up causing County Council to retain an outside accounting firm to perform an audit or an accounting which, in the end, found Holland had not engaged in any malfeasance or incompetence, but rather that she performed her job duties in the correct manner.

28. That many employees at the defendant, including management employees, felt that Beckert displayed animus against females in the way he dealt with Holland during this dispute.

29. That in or around November and December of 2019 and, to a lesser extent in or around January of 2020, Jacobs herself would informally complain to plaintiff about Beckert, stating that Beckert was a "nut job," that he was "totally nuts," that he was "insane, entirely unreasonable, and impossible." She further told plaintiff that Beckert bullied women in the workplace; that he discriminated against women in the workplace; that she was fed up with him; that she wanted to sue him and had been meeting with her personal attorney about doing so. She also told plaintiff that she wanted fellow female employees Maria Walls ("Walls") (Hispanic), Holland, and the County Assessor, Ebony Sanders ("Sanders") (African American) to join her in suing him, as they had been subjects of his discriminatory conduct as well.

30. That at the time, plaintiff was aware of Beckert's reputation, and his personality in general. As such, plaintiff felt the allegations by Jacobs likely had merit. But, by January of 2020, Jacobs ceased her complaints to plaintiff about Beckert, and she never took any action against him.

31. That still Beckert's mistreatment (and discrimination) of women and minorities in the workplace at defendant continued.

32. That by way of example, on one occasion Beckert could not gain access to a WebX meeting because he did not know how to do so. When he tried to join in the meeting but could not, he became furious at Sanders, accusing her of intentionally and willfully excluding him from the meeting and of being incompetent and disrespectful. Of course, his accusations against Sanders were completely untrue. All of Beckert's chaotic and disruptive conduct was because he did not know how to operate his phone or computer to join the meeting. It had nothing to do with Sanders.

33. That in or around the end of April or May of 2020, Beckert began to harass Sanders over a tax dispute between the Assessor's Office and a private citizen, with the taxpayer demanding more favorable tax treatment from the County. The taxpayer was represented by a local attorney who, upon information and belief, had a long and well-established relationship with Beckert, oftentimes dealing with Beckert on tax issues for his clients. Some employees at the defendant say that Beckert and the said attorney are friends.

34. That in pursuing the issue, Beckert demanded that Sanders provide him with all the information her office (the Assessor's Office) had on the taxpayer – some of which was private and confidential and inappropriate for Sanders to release. Beckert also demanded that Sanders personally meet with him over the issue. With plaintiff's consent and advice, Sanders provided Beckert with information on the taxpayer that would otherwise be available through a Freedom of Information Act request. At the same time, Sanders told Beckert there was no reason to meet on the issue and that she could not legally provide him with any more information on the taxpayer. But for whatever reason, Beckert just would not take no for an answer from Sanders and he continued to demand that she turn over more information on the taxpayer even though to do so could be illegal or inappropriate; he continued to demand that Sanders personally meet with him on the issue; and he continued to harass Sanders.

35. That in seeking the taxpayer information and in demanding a personal meeting with Sanders, Beckert would send Sanders harassing emails that were disrespectful, demeaning, rude and slanderous. These emails would state or suggest that Sanders was incompetent, that she could not perform her job, and that she was disrespectful and a racist. Worst of all, Beckert would intentionally copy these emails to Sanders' superiors such as Jacobs, plaintiff, and others.

36. That as one of her direct supervisors, plaintiff knew Sanders was a competent employee who acted in a professional manner in the workplace. Plaintiff also knew from being somewhat involved in the issue, that Beckert's allegations were false and that Sanders was handling the matter and performing her job in a competent, correct manner. Indeed, it was Beckert who, as County Auditor, was attempting to meddle in a private dispute between a taxpayer and the County Assessor's Office; it was Beckert who was requesting information he had no right to have; and it was Beckert who was harassing the Assessor (Sanders) in undertaking his misguided mission.

37. That Sanders was very upset and anxious with Beckert's repeated emails that contained false statements about her that he would send to her superiors.

38. That around this same time (the beginning to mid-May of 2020), Jacobs and the interim part-time Human Resource Director, Kincaid, scheduled a performance review with plaintiff for May 18, 2020. Plaintiff was supposed to have had his six (6) month performance review in March of 2020, but at the time Jacobs told plaintiff she would have to postpone it.

39. That in the meantime, on or about March 16, 2020, the defendant declared a State of Emergency due to the COVID-19 virus. The defendant continued to work and function, but the State of Emergency (or some other circumstance) seemed to cause Jacobs an undue amount of distress and anxiety and to act in an erratic manner on occasion.

40. That on or about May 18, 2020, plaintiff met with Jacobs and Kincaid in the conference room in the Administration Building for plaintiff's belated performance review. The review was entirely verbal. It consisted of approximately five (5) minutes of introductory remarks, followed by about forty (40) minutes talking about plaintiff's success in the position. For example, Jacobs praised plaintiff for establishing and implementing his agenda review

process. Like most evaluations, it ended with a discussion about a handful of areas where plaintiff could improve. As for criticism, Jacobs pointed to the following areas where plaintiff's work performance could allegedly improve (most of which were not valid):

a) Plaintiff needed to be more careful in his communications with County Council, as on one occasion during lunch with two (2) County Council members, plaintiff provided them with an update on the hiring of a new Public Information Officer. However, approximately two (2) days after the conversation with the County Council members, plaintiff voluntarily told Jacobs about it. According to Jacobs, it was inappropriate for plaintiff to provide the said hiring information, but she did console plaintiff by telling him not to worry, and that "everyone makes mistakes;"

b) Plaintiff needed to be more knowledgeable about the budget. While plaintiff agreed, he still took issue with this criticism because Jacobs assured him during his interview for the position that she would train him on the budget and that her training would include (or be supplemented by) sending plaintiff to workshops and seminars. None of the above ever took place;

c) Jacobs also criticized plaintiff for allegedly allowing a fire consolidation issue to go before Council even though the Chairman of the Fire Commission began to express concerns about the issue at the eleventh hour. However, Jacobs is the one that approved moving forward with the issue, not plaintiff. As such, this criticism appears to be misplaced;

d) Jacobs then attempted to critique plaintiff on an issue related to the Solid Waste Enterprise Fund, however Jacobs had a hard time articulating the criticism, she became flustered, and just moved on;

e) Jacobs stated plaintiff failed to brief her on the Daufuskie Island Ferry grant, criticism that was wholly unfounded as plaintiff had briefed Jacobs on the issue several times; and

f) Jacobs felt plaintiff did not act with urgency in preparing a COVID reopening plan. However, Kincaid interjected that this criticism was not valid.

41. That overall the evaluation was a good one (or acceptable), with mostly praise and some critique. At the end of the evaluation, Jacobs and plaintiff agreed to meet every

Monday at 8:30 a.m. to ensure they were both on the same page, and then to have a 30-day follow up meeting.

  42. That shortly after the evaluation, plaintiff contacted Kincaid to ask her about the 30-day follow-up meeting, as plaintiff was concerned the meeting had a negative connotation. In response, Kincaid assured plaintiff in a sincere manner that the 30-day follow-up meeting was her idea; it meant nothing negative; it was not disciplinary; it was not even a performance improvement plan; and that the May 18, 2020 meeting was a performance evaluation and nothing more.

  43. That on or about May 22, 2020, once again Beckert sent a harassing email to Sanders requesting a meeting with her and requesting more private information on the taxpayer. Once again, Beckert copied the email to Sanders' supervisors, including plaintiff. This time, though, plaintiff responded to the email advising Beckert in a firm yet professional manner that Sanders would not be meeting with him as it was not a necessary, appropriate, or a productive use of her time. Plaintiff did, however, present Beckert with an option by advising that he or the County Attorney would be willing to meet with Beckert but, if they did, they would not be providing him with any private or confidential taxpayer information.

  44. That on or about Monday or Tuesday, May 25 or 26, 2020, Jacobs and plaintiff had their first Monday morning meeting. It was uneventful.

  45. That on or about Tuesday, May 26, 2020, Sanders called plaintiff upset, complaining that she felt Beckert was harassing her based on her race and gender by repeatedly sending her (and her supervisors) false and demeaning emails accusing her of not being competent. She also pointed out that Beckert did not treat the past two (2) Assessors who were white males in the same manner.

46. That on or about Wednesday, May 27, 2020, Sanders walked into plaintiff's office unannounced and visibly upset. She told plaintiff she felt Beckert was harassing her because she was a woman and/or because she was African American. She further expressed that Beckert did not treat the prior Assessors, who were both Caucasian males, the same way he treated her. And, she complained that Beckert was bullying her and copying his demeaning and false or misleading emails (which alleged she was not performing her job) to her supervisors. Ms. Sanders also expressed frustration that Beckert's conduct towards her had been going on for months; she had given him every bit of personal taxpayer information that she could legally provide to him, but that he still demanded more meetings and more private taxpayer information. Sanders reiterated that, when the prior Caucasian male Assessors would push back on Beckert, he would treat them with respect and not press the matter. In the end, Sanders stated that Beckert's conduct was causing her anxiety and distress at work and at home; that she worked hard and tried to do the right thing; and that it was causing her great pain and distress that Beckert was falsely accusing her of not doing her job when, in fact, she was doing precisely what she had been trained to do by previous Assessors.

47. That having seen some of the emails Beckert sent to Sanders and recalling some of Jacobs' past complaints about Beckert's conduct toward women in the workplace, plaintiff felt there may be merit to Sanders' claims. At the same time, plaintiff was not authorized to further help Sanders, as he did not supervise Beckert; plaintiff lacked authority to discipline Beckert; he had never been trained on discrimination and/or harassment by the defendant in any shape or form; and he did not have authority to initiate or conduct an investigation into Sanders' complaints.

48. That on or about the next day, plaintiff called Milton Boswell ("Boswell"), the Deputy Assessor who had worked in the Assessor's Office for around thirty (30) years. In doing so, plaintiff wanted to determine if Boswell observed any conduct or interactions which could substantiate Sanders' allegations so plaintiff would know how to deal with the situation. After all, given his long tenure with the defendant, and the fact that he worked with at least two (2) prior white male Assessors, Gary James ("James") and Ed Hughes ("Hughes"), Boswell was in an especially good position to assess Sanders' complaints.

49. That Boswell confirmed Sanders' allegations, telling plaintiff that Beckert was treating Sanders less favorably than he treated James and Hughes; that in his view, Beckert was treating Sanders in a harassing manner because of her gender and/or race; and that he never observed Beckert attacking the competence or work abilities of the two (2) prior Assessors. According to Boswell, Beckert always treated James and Hughes in a friendly and professional fashion and in a manner that respected their boundaries.

50. That on or about the next day, Friday, May 29, 2020, plaintiff emailed and spoke to the new County Attorney, Kurt Taylor (Taylor"), about the situation. Specifically, plaintiff told Taylor about Sanders' complaints, his conversation with Boswell, and conveyed his opinion that Beckert's conduct may give rise to claims against the defendant for harassment based upon race and gender.

51. That plaintiff also reminded Taylor that Beckert's conduct could expose the defendant to liability and that the defendant had a duty to address and stop any alleged harassment. Taylor agreed that he should speak to Beckert about the matter. Plaintiff concluded the conversation, advising Taylor that he would be speaking to Jacobs about it Monday, June 1, 2020 first thing in the morning. As such, as set forth in Paragraphs 50 and 51, plaintiff engaged

in protected activity under Title VII by reporting and by opposing race and gender discrimination.

52. That on or about June 1, 2020 during their second Monday conference (as agreed to at plaintiff's evaluation) plaintiff told Jacobs that Beckert was harassing Sanders on account of her gender and race. Plaintiff also advised Jacobs that Beckert's conduct could expose the defendant to liability and that the defendant needed to take steps to end the harassment. Plaintiff also offered to serve as a buffer between Beckert and Sanders when Beckert bothered her with his questions or demands for inappropriate tasks. As such, plaintiff once again engaged in protected activity under Title VII.

53. That in response, Jacobs advised plaintiff that she was receiving advice from outside counsel and that she had already briefed County Council on the issue. She further directed plaintiff to *not* engage Beckert or argue with him and not to respond to any of his emails. Surprisingly, Jacobs then said that the "County may just have to carry" any legal exposure or liability created by Beckert's conduct.

54. That on or about Wednesday, June 3, 2020 at or around 10:00 a.m., Jacobs summoned plaintiff to the Human Resources Department for a meeting. When plaintiff arrived, Jacobs and Kincaid were both present. In short order, Jacobs fired plaintiff without any prior warning, notice or cause, and for false reasons and/or trivial reasons that were unworthy of credence. Moreover, Jacobs fired plaintiff literally within about forty-eight (48) hours after plaintiff complained to her about discrimination. In the process, Jacobs never really provided plaintiff with a reason for the abrupt firing but, instead, used trite, meaningless terms, telling plaintiff "things just [weren't] working out for [plaintiff] in the position;" that plaintiff's heart was in the right place; and that plaintiff was a good person.

55. That then, knowing plaintiff had life-long plans to live, work and retire in Beaufort, Jacobs leaned forward across the table towards plaintiff and, with furrowed brows, stated in a stern voice that she was now giving plaintiff his opportunity to transfer out of Beaufort County. This intentionally insensitive remark shocked and traumatized plaintiff, given that Jacobs was aware of plaintiff's love for Beaufort County and his plans to always work there. Plaintiff was then asked to hand over his keys, badge, and phone and offered a severance package before being escorted out of the building without being allowed to first retrieve his personal belongings. Plaintiff was shocked and upset.

56. That believing he had been wrongfully terminated for opposing or complaining about race and gender discrimination, plaintiff filed a grievance in relation to his firing.

57. That plaintiff's grievance hearing took place on or about July 30, 2020, in front of the Beaufort County Grievance Committee which consisted of four (4) Beaufort County employees. At the hearing, plaintiff made a presentation for almost an hour, explaining why he should not be fired. Jacobs decided not to attend the hearing but, instead, she prepared a letter explaining her reasons for terminating plaintiff and had the letter read to the committee. Jacobs also had two (2) other letters from individuals, who were not employees of the defendant, read to the committee.

58. That the letter Jacobs prepared, which was read into the record, shotguns approximately seven (7) different vague performance-related reasons for her actions, none of which she brought up at plaintiff's termination meeting and all of which involved incidents that occurred well before plaintiff's May 18, 2020 performance review. Moreover, all the incidents

15

referred to in her letter either did not involve plaintiff or any fault on plaintiff's behalf, or they were too vague to have value.

59.    That on or about July 31, 2020, the Beaufort County Employee Grievance Committee voted 4-0 in plaintiff's favor that his termination was ***unjustified*** (or that he should not have been fired).  They also ordered that plaintiff be reinstated, but into a position other than his Deputy Administrator job.

60.    That not surprisingly, Jacobs reversed the opinion of the far more objective Grievance Committee because, in her view, plaintiff misrepresented factual disputes to the Committee when he was presenting his side of the case – a surprising position given Jacobs chose not to attend the hearing thereby waiving her right to cross examine plaintiff or rebut his case.

61.    That on or about August 23, 2020, plaintiff was granted full unemployment benefits by the South Carolina Department of Employment and Workforce which held that there was "insufficient evidence of improper activities connected with [plaintiff's] work."

### FOR A FIRST CAUSE OF ACTION:
### VIOLATION OF TITLE VII
### 42 U.S.C. § 2000e-3
### RETALIATION

62.    That the plaintiff hereby realleges each and every allegation contained in Paragraphs 1 through 61 hereinabove as fully as if set forth verbatim.

63.    That at all pertinent times defendant employed fifteen (15) or more employees and, as such, defendant is an "employer" as defined by Title VII, and otherwise subject to the said Act.

64.    That as alleged above, plaintiff engaged in protected activity by reporting gender and race discrimination and opposing it on several occasions, most recently on or about

16

May 29, 2020 to the County Attorney, Taylor, and on or about June 1, 2020 to the County Administrator, Jacobs.

65. That plaintiff's reports and accompanying opposition were made to defendant in good faith and constitute protected activity under Title VII.

66. That shortly after engaging in said protected activity (specifically, two (2) days after plaintiff's last discrimination report) defendant fired plaintiff without warning, notice or cause and for false reasons and/or reasons not worthy of credence. As such, a causal connection exists between plaintiff's protected activities and the adverse action defendant took against him. Defendant really fired plaintiff in retaliation for engaging in protected activity under Title VII by opposing and reporting race and gender discrimination to defendant, all of which is a violation of 42 U.S.C. § 2000e-3.

67. That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, moving expenses, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and plaintiff further seeks her attorney's fees and costs and prejudgment interest.

68. That the defendant's actions as set forth above were undertaken intentionally, knowingly, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant, if permitted by law (to the extent plaintiff can recover such damages against a County of the State of South Carolina).

WHEREFORE, as to all causes of action, plaintiff prays for judgment against the defendant for such amount of actual and special damages as the trier of fact may find, (including lost back and future wages, income and benefits, expenses associated with finding other work, moving expenses, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries), punitive damages (to the extent plaintiff can recover such damages against a County of the State of South Carolina), the costs and disbursements of this action, including his reasonable attorney's fees, prejudgment interest, and for such other and further relief as the court deems just and proper.

HITCHCOCK & POTTS

By: *s/A. Christopher Potts*
Federal ID No.:  5517
Post Office Box 1113
Charleston, SC 29402
Telephone:  (843) 577-5000
Fax:  (843) 722-8512
Email:  hitchp@bellsouth.net
***Attorneys for the Plaintiff***

Charleston, South Carolina
May 12, 2022